**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**LISA MARTINEZ,**

                    **Plaintiff,**

**-vs-**                                         **Case No.  6:04-cv-1467-Orl-31JGG**

**MERCEDES HOME REALTY, INC.,**

                    **Defendant.**

_____

# ORDER

In this case, the Plaintiff, Lisa Martinez ("Martinez"), has sued the Defendant, Mercedes Homes Realty, Inc. (the "Defendant"), alleging violations of both the Family and Medical Leave Act, 29 U.S.C. 2601, *et seq.* ("FMLA") and Title VII of the Civil Rights Act, 42 U.S.C. section 2000e, *et seq.* ("Title VII").[1] This matter is presently before the Court on the Defendant's Motion for Summary Judgment (Doc. 29), and Martinez' Opposition thereto (Doc. 36).

## I.    Background

A. The Parties

Martinez is a former employee of the Defendant.  She resides in Orange County, Florida.

The Defendant is a Florida corporation engaged in the business of selling homes in the state of Florida.  The Defendant is an "employer" under the terms of the FMLA and Title VII.  The Defendant sells homes through its sales representatives, who are assigned to, and rotated through, various properties the Defendant owns.

_____

[1] Martinez' Complaint appears at Doc. 1.

B. Facts

The Defendant hired Martinez as a sales representative in July of 2000.  (Doc. 27, Att. 2 at 6; *id*. at Att. 4 at 17-18).[2]  When she was hired, she signed a Sales Representative Agreement, pursuant to which she agreed that the minimum sales requirement was four homes per month. (Doc. 27, Att. 2 at 7; *id*. at Att. 8, Ex. 2 at 2).  As a sales representative, she was assigned to various communities or properties as needed, she was subject to customer satisfaction ratings, and her earnings were based on commissions.  (Doc. 27, Att. 8, Ex. 2 at 2).  She was initially assigned to the Sunburst property, and was subsequently rotated through various other properties.  (Doc. 27, Att. 2 at 8; *id*. at Att. 3 at 7).  From the time of her hiring until the end of 2001, Martinez' sales met expectations.[3]

At the end of January of 2002, Martinez requested, and was granted, eight weeks of maternity leave.  (Doc. 27, Att. 2 at 8).  Prior to this time, she had been assigned to the Lakeside Reserve property.[4]  (*Id*.).  This community was a "problem community," and Martinez felt that her assignment there impacted her ability to make sales.  (Doc. 27, Att. 5 at 1).

Martinez returned from her FMLA leave on April 1, 2002.[5]  (Doc. 27, Att. 2 at 9).  She did not have the option of returning to her position as a sales representative at Lakeside Reserve,

---

[2] The deposition filed in Doc. 27 was filed in a format such that four deposition pages appear on a single document page.  Therefore, page references to Doc. 27 refer to the single document page, not to the numbered deposition pages.  For example, "Doc. 7, Att. 2 at 6" refers to page 6 of Att. 2 (which contains pages 18-21 of the deposition).

[3] Maggie Toro indicates that at the beginning of Martinez' employment, her performance was "very good."  (Doc. 37 at 65).

[4] The Defendant notes that Martinez "disliked" this property.  (Doc. 29 at 8, 11).

[5] Both before and after her maternity leave, Martinez was able to sell inventory homes at any location, even if she was not assigned to the property at which the home was located.  (Doc. 28 at 2).

because another sales representative had been assigned to that property in her absence.  (Doc. 27, Att. 4 at 18).  At that time, she was considered for a promotion to a managerial position.  (Doc. 27, Att. 2 at 9).  The process lasted throughout the month of April, during which time she interviewed with the Defendant's owners.  (*Id.*).  During this time, she helped out by filling in for people who were out on vacation or called in sick.  (*Id.*; Doc. 27, Att. 3 at 7).  Ultimately, the management position was given to Cristina Quintana ("Quintana"), to whom Martinez began to report directly. (Doc. 27, Att. 2 at 10).

Martinez then requested that she be assigned to the Enclave property, even though she knew that it would be difficult to make sales there.  (Doc. 27, Att. 2 at 10; Doc. 27, Att. 4 at 7).  At that time, construction of model homes at the Enclave was behind schedule.  (Doc. 27, Att. 2 at 10).  Therefore, during the period between May and June of 2002, Martinez was assigned to various properties on an as-needed basis, to fill in for other sales representatives, until the Enclave was ready.[6]  (Doc. 27, Att. 3 at 7).[7]  During that time, Martinez made sales at various sites, and

---

[6] The Defendant asserts that Martinez "agreed to float" on a temporary basis while waiting for the Enclave property to be made ready.  (Doc. 29 at 11).  She worked at Oakshire Estates for several weeks, then went to Wekiva Oaks to cover for a sales representative for seven to ten days.  (Doc. 27, Att. 2 at 10).  She then went to Lakeshire Reserve to cover for another sales representative, and then returned to Oakshire Estates.  (*Id.*).  She was sent back to Oakshire Estates because, at that time, there was nowhere else for her to go.  (*Id.*).  Because there was nowhere for her to go, the agreement made with the Defendant was that she would fill in while other sales representatives were on vacation. (Doc. 27, Att. 4 at 7).  During this time, she also worked for several weeks at an area called John's Cove.  (Doc. 27, Att. 2 at 10).  Maggie Toro asserts that Martinez wanted to "float" and to have the opportunity to work in different communities, because by selling model homes, which she was able to do while "floating," she could get paid quickly.  (Doc. 37 at 24-25, 61).

[7] *See* Doc. 27, Att. 3 at 7:

Question: Now when you came back from your leave in 2002, you weren't put in a new community right away because you were going to be assigned to the community

also pre-sold homes at the Enclave.[8]  (Doc. 28 at 2).  Although Martinez says that other sales representatives were not required to work in this "fill-in" fashion, she does not attribute her situation to any ill will on the part of the Defendant.[9]  (Doc. 27, Att. 3 at 7).  She also states that upon returning from leave, and after the decision was made that she would not receive the management position, she would have liked to have been assigned to a single community.  (Doc. 27, Att. 5 at 1).  Her commissions and income were affected by her being moved around.  (Doc. 27, Att. 4 at 10).[10]  Martinez complained to Maggie Toro ("Toro"), who told Martinez that she would eventually get a community.  (*Id*. at 8).  In August of 2002, Martinez was assigned to the Enclave, where she stayed until March of 2003.  (*Id*. at 7).

---

you requested, but it just wasn't ready, right?
Answer: No, I wasn't put anywhere because I was originally -- Maggie said she wanted me to wait because she wanted me to interview for the management position.  After that, then I filled in for Cristina and then they started using me to fill in for vacations awaiting the other community to open up.

. . .

Q: What was what?
A: The Enclave.

. . .

Q: As to the time that you were filling in, you were waiting for the community that you were requesting, it just wasn't ready yet?
A: Yes. But some people request communities and they send them to another community. And then when the other community is ready, they send them over. To me, that didn't happen. I was asked to fill in. . . .

[8] The Defendant asserts that during this time, Martinez could sell any home in the Defendant's inventory, as well as pre-sell homes in the Enclave.  (Doc. 29 at 11).

[9] At the same time, however, she states that because no one else was being "bounced around" at that time, she implies that she was treated that way in retaliation for having taken maternity leave, notwithstanding the fact that the first thing that happened when she came back from leave was that she was considered for a management position.  (Doc. 27, Att. 4 at 10).

[10] Martinez bases her claim (at least partially) that she was treated less favorably than other non-pregnant similarly-situated employees on the fact that she had different assignments (was "bounced around") before going to the Enclave.  (Doc. 27, Att. 4 at 11).

A review of Martinez' sales for the fiscal year ending January 31, 2003, shows that Martinez had made only fifteen sales during the previous 12 months.  (Doc. 27, Att. 3 at 1; *id*. at Att. 8, Ex. 6).[11]  Subtracting two months for her maternity leave, and another month for the time during which she was considered for a promotion to management, those numbers result in an average of less than two sales per month.[12]  Further, customer satisfaction surveys revealed that Martinez was receiving below the expected score, and was receiving the second lowest score in the sales group.[13]  (Doc. 27, Att. 8, Ex. 5).  On February 3, 2003, Martinez received a 30-day warning notice.[14]  (Doc. 27, Att. 8, Ex. 6).[15]  Although Martinez did not make the required four sales during the next thirty days, she was not terminated.  (Doc. 37 at 38).  Instead, Toro gave her the opportunity to improve her performance.  (*Id*.).

---

[11] *See also* Doc. 27, Att. 4 at 18 (noting that Martinez did not meet her quota in 2002); Doc. 37, Ex. 5 (noting that from February 1, 2002, to December 31, 2002, Martinez had only 12 sales).

[12] Martinez asserts that the low sales were a result of pricing issues.  (Doc. 27, Att. 2 at 12).  However, she also states that sales at the Enclave did not improve even after prices were reduced.  (*Id*. at 6).

[13] Sales representatives were expected to have an average score of 90, but Martinez' average was 78.93.  (Doc. 27, Att. 8, Ex. 5; Doc. 28 at 3).

[14] Martinez states that Quintana called her in and told her that she was going to be fired because of her sales.  (Doc. 27, Att. 2 at 11).  After deciding that Martinez would not be fired, Quintana told Martinez that she would be expected to gross four completed sales in the next thirty days.  (Doc. 27, Att. 3 at 2).  Martinez does not know of a reason that the Defendant would have fired her other than because of her performance.  (*Id*. at 5).

[15] Martinez states that Maria Mercado told her that she had received multiple letters regarding her (Mercado's) performance.  (*Id*. at 13).  Martinez does not know how many warnings she (Martinez) should have received, and only knows that she was told that other people received several warnings.  (Doc. 27, Att. 5 at 14).

Shortly after Martinez received the warning notice, Toro visited the Enclave to meet with Martinez, and asked Martinez where she would like to work.  (Doc. 27, Att. 3 at 2; Doc. 37 at 20).  Martinez requested to work at East Park, although she knew that East Park had not yet been constructed.  (Doc. 27, Att. 2 at 17; *id*. at Att. 3 at 2).  Martinez indicated that she wanted to work there because of the challenge of selling from blueprints rather than from a model.  (Doc. 27, Att. 2 at 17).  She also believed that East Park would be best suited for her, among the options available at that time.  (Doc. 27, Att. 4 at 7).  Martinez was assigned to East Park in March of 2003.  (Doc. 27, Att. 3 at 2; Doc. 37 at 20).

Martinez' performance did not improve after her assignment to East Park.  (Doc. 27, Att. 3 at 4; *id*. at Att. 8, Ex. 7).  For the period from March to June of 2003, she made only sale at East Park, and had only nine total sales after February 1, 2003.[16]  In addition, she continued to receive complaints from customers.  (Doc. 27, Att. 8, Ex. 8 and 10).  Martinez claims that during this time, the other sales representative at the same property was given important information that Martinez did not receive.  (Doc. 27, Att. 2 at 17; *id*. at Att. 4 at 2-3).  During her time at East Park, on May 19, 2003, Martinez informed Toro that she was pregnant.  (Doc. 37 at 33, 44).  She did not make a request for FMLA leave at that time.  (Doc. 27, Att. 5 at 3, 4).  The Defendant terminated Martinez' employment on June 16, 2003.  (Doc. 27, Att. 8, Ex. 11).  The letter given to Martinez noted her failure to make any new sales during the previous two and one half months and her failure to improve her sales performance despite several opportunities to do so, as well as the fact

_____

[16] *See* Doc. 27, Att. 4 at 18 (noting that Martinez did not meet her quota in 2003); *see also id*. at 6 (Martinez agrees that she was not selling four homes per month in 2003).

that at the time of her termination, she had only reached fifty per cent of her year-to-date sales goal.[17]  (*Id.*).

Martinez asserts that her poor sales were partly due to the fact that she was not assigned to a community at which to make sales, whereas other new hires were given communities.  (Doc. 27, Att. 3 at 6).  However, Toro asserts that Martinez was given "six months of total free reign of wherever she wanted to be," but despite those opportunities, she did not sell like she was supposed to.  (Doc. 37 at 38).  Martinez also asserts that other sales representatives failed to meet expectations, but alleges that they were not terminated.[18]  (Doc. 27, Att. 5 at 3, 13).

C. Claims and Arguments

In Count I of her Complaint, Martinez alleges that the Defendant interfered with her rights under the FMLA by: (1) failing to return her, upon her return from FMLA leave, to the same position or to an equivalent position; and (2) terminating her employment after she gave notice of intent to take additional FMLA leave.  In Count II, Martinez asserts a claim for retaliation under the FMLA, and alleges that her requesting and taking of FMLA leave constituted a statutorily-protected activity, and that the Defendant retaliated against her for engaging in that activity by: (1) purposely assigning her to less desirable duties, which affected her compensation; and (2) terminating her employment after she gave notice of intent to take additional FMLA leave.

---

[17] Quintana states that Martinez was terminated for unsatisfactory sales performance and for unsatisfactory customer service.  (Doc. 28 at 3).  The record contains several complaints regarding Martinez' performance, including her failure to return deposits and her failure to follow up with appropriate documentation.  (*See* Doc. 27, Att. 8, Ex. 8 and 10).

[18] She also states, based on a "guesstimation," that no one was terminated during her employment for the failure to meet sales quotas.  (Doc. 27, Att. 6 at 1).

Martinez' third count asserts a claim under the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k).  There, she alleges that the Defendant discriminated against her on the basis of her pregnancy by: (1) failing to return her, after her pregnancy leave, to the same position or to an equivalent position; (2) purposely assigning her to less desirable duties, which affected her compensation; and (3) terminating her employment after she gave notice of intent to take a second pregnancy-related leave.  Finally, she alleges that, after her termination, either the Defendant hired a male or a non-pregnant female to replace her, or her position remained open.

The Defendant argues that Martinez received all of the rights to which she was entitled under the FMLA, and that her employment was terminated for legitimate, non-discriminatory reasons.

## II.    Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).[19]

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

## III.    Legal Analysis

### A. Family and Medical Leave Act

The FMLA provides that eligible employees are entitled to a total of twelve workweeks of leave during any twelve month period for, *inter alia*, the birth of a child of the employee in order to care for that child. 29 U.S.C. § 2612(a)(1)(A). Where an eligible employee takes leave under section 2612, that employee is entitled, upon return from leave, to be restored to the position she

---

[19] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

held when the leave began, or to an equivalent position with equivalent benefits, pay and terms and conditions of employment.  29 U.S.C. § 2614(1).  The FMLA "also protects employees from being discriminated against by their employers for exercising or attempting to exercise the rights it provides."  *Brungart v. Bellsouth Telecomm., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).  Employers are thus prohibited from discriminating against employees who have used FMLA leave.  *Id*.

> The FMLA creates two types of claims:
>
> interference claims, in which an employee asserts that [her] employer denied or otherwise interfered with [her] substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act.

*Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001).  To state an interference claim, "an employee need only demonstrate by a preponderance of the evidence that [she] was entitled to the benefit denied."  *Id*. at 1206-7.  The employee does not have to make allegations regarding her employer's motives or intentions; she need only demonstrate that she was entitled to, but was denied, the right in question.  *Id*. at 1208.  "To establish a prima facie case of FMLA *discrimination*, the Plaintiff must establish each of the following elements: (1) that she availed herself of her FMLA rights; (2) that she suffered an adverse employment action; and (3) that a causal link exists between the two elements."  *Rocky v. Columbia Lawnwood Reg'l Med. Ctr.*, 54 F. Supp. 2d 1159, 1169-70 (S.D. Fla. 1999).

To state a claim for retaliation, the employee "must demonstrate that [her] employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right."  *Strickland*, 239 F.3d at 1207.  The employee thus bears the increased burden of demonstrating that the employer's actions were motivated by an impermissible animus.

-10-

*Id*. When evaluating claims of retaliation under the FMLA, absent direct evidence of discrimination, courts apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas*.[20] *Brungart*, 231 F.3d at 798. To establish a *prima facie* claim of retaliation, Martinez must show that: "(1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action."[21] *Id*. at 798. An "adverse employment action" is any ultimate employment decision, such as a discharge "or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). "To establish the causal connection element, a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated." *Brungart*, 231 F.3d at 799 (internal citations and quotations omitted).

Once the plaintiff claiming retaliation establishes a *prima facie* case, a presumption of discrimination is created. *Standard v. A.B.E.L. Servs., Inc*., 161 F.3d 1318, 1331 (11th Cir. 1998). The burden then shifts to the defendant "to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) (internal citation and quotation omitted). The defendant does not have to persuade the court that it was actually motivated by those reasons. *Tex. Dept. of*

---

[20] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[21] The plaintiff's burden at this stage is the preponderance of the evidence standard. *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Although the burden of production then shifts to the defendant, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id*. at 253.

*Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  Instead, the defendant must only offer

sufficient evidence to create a genuine issue of fact as to whether it discriminated against the

plaintiff, and may do so by introducing evidence demonstrating the reasons for the action taken

against the plaintiff.  *Id*. at 255.  The defendant's explanation in this regard must be "legally

sufficient to justify a judgment for the defendant."[22]  *Id*.  "If the defendant offers legitimate

reasons, the presumption of retaliation disappears. The plaintiff must then show that the

employer's proffered reasons for taking the adverse action were actually a pretext for prohibited

retaliatory conduct."  *Sullivan*, 170 F.3d at 1059 (internal citations omitted).  The plaintiff may do

so either by "persuading the court that a discriminatory reason more likely motivated the employer

or indirectly by showing that the employer's proffered explanation is unworthy of credence."

*Burdine*, 450 U.S. at 256.

Martinez' claims under the FMLA fall into two categories: first, that she was treated

differently upon her return from her first pregnancy; and, second, that she was fired upon giving

notice of the need for additional FMLA leave for her second pregnancy.  The Court will address

these in reverse order.

### 1) Termination

For a plaintiff to avail herself of her FMLA rights, she must comply with the FMLA's

notice requirements.  *Rocky*, 54 F. Supp. 2d at 1170.  If the leave is foreseeable, "an employee

must give an employer at least thirty days notice of her intent to take such leave."  *Id*.; *see also* 29

---

[22] At the same time, however, the defendant's burden is only one of production, not of proof, and this burden is "exceedingly light."  *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

C.F.R. § 825.302(a).  That notice "must state the anticipated timing and duration of the leave, and

must be sufficient to make an employer aware that the employee needs FMLA-qualifying leave."

*Rocky*, 54 F. Supp. 2d at 1170 (internal citation and quotation omitted); *see also Williams v. Air*

*Prods. & Chems., Inc.*, 2005 WL 2007098 at *4 (N.D. Fla. Aug. 16, 2005) (employee must only

make employer aware that absence is due to potentially FMLA-qualifying reason); 29 C.F.R. §

825.302(c).  The bottom line, however, is that while the employee need not cite to the FMLA, she

must clearly state that leave is necessary.  *See* 29 C.F.R. § 825.302(c) ("The employee need not

expressly assert rights under the FMLA or even mention the FMLA, but may only state that *leave*

*is needed* for an expected birth . . . .") (emphasis supplied); *Peters v. Cmty. Action Comm., Inc. of*

*Chambers-Tallapoosa-Coosa*, 977 F. Supp. 1428, 1436 (M.D. Ala. 1997) (when giving notice of

leave, employee did not have to invoke FMLA, but did have to give notice of "serious health

condition *for which she was taking leave*.") (emphasis supplied).

　　　In this case, the only thing of which Martinez gave notice to the Defendant regarding her

second pregnancy was that she was pregnant, and she only did that when she was "only a couple of

months pregnant."  (Doc. 27, Att. 5 at 4).  Martinez states clearly that she did not ask for FMLA

leave for this second pregnancy, and gives no indication that, prior to the time she was fired, she

ever asked for, or stated an intention to take, any sort of leave in relation to the birth of her second

child.  (Doc. 27, Att. 5 at 3-4).[23]  Without requesting leave, Martinez cannot have engaged in

---

[23] *See* Doc. 27, Att. 5 at 3-4:

Question: All right. And it says, "On June 16th, 2003, Defendant terminated Plaintiff's
employment while she was pregnant and prior to her being able to take additional
FMLA leave to give birth to the child, this child, and care for this newborn child."
Now you hadn't asked for FMLA leave for the birth of this child that occurred in 2003,

statutorily protected conduct or attempted to avail herself of her rights under the FMLA.

Therefore, she has failed to establish the first element of a claim under the FMLA, for either

discrimination or retaliation, as it relates to her termination.[24]

    *2) Differential treatment and retaliation upon return from FMLA leave*

        *i. Discrimination*

Martinez claims that, upon her return from FMLA leave, the Defendant failed to return her

to the same or an equivalent position, and instead assigned her to less desirable duties.  She asserts

that she was discriminated against because before her first pregnancy, she had done a good job, but

that when she returned from leave, she was not returned to an equivalent position with equivalent

pay, benefits, and working conditions because on her return, she was "bounced around from place

---

right?

Answer: No, I had told Maggie that I was pregnant. And then the following week when Cristina came back, she made an announcement that I was pregnant.

    . . .

Q: If you take a look at paragraph 18 of the complaint, it says, "Defendant by terminating Plaintiff upon notice of her intent to take leave a second time under the FMLA to give birth, to take care of her new child." But you had never asked for FMLA leave in 2003, right?

A: I can't say that I asked for the leave. But the intent of me getting pregnant would mean that I would leave again.

Q: Okay. But you never notified anyone, "I intend to take FMLA leave in 2003?"

A: In my mind, it kind of goes hand in hand. . . .

Q: You never asked anyone for FMLA leave at that point in time in 2003?

A: No I didn't at that time. I was only a couple of months pregnant. I didn't know I had to ask.

[24] Martinez makes the conclusory assertion that her termination "was motivated by the fact that she had taken FMLA and because of her pregnancies." (Doc. 36 at 10). Even assuming that she has stated a *prima facie* claim of retaliation in regard to her termination, she has failed to rebut the non-discriminatory reasons the Defendant offers for the action. The Defendant asserts that Martinez was terminated for poor sales and poor performance reviews. Martinez fails to offer specific evidence to rebut those assertions, and thus she has failed to carry her burden of persuasion.

to place," which prevented her from setting up a customer base.  (Doc. 27, Att. 4 at 8, Att. 5 at 2).

She also asserts that this being "bounced around" means that she was treated less favorably than

other similarly situated employees.  (Doc. 27, Att. 4 at 11).  While she admits that her benefits,

such as insurance, did not change, she indicates that her pay changed because she wasn't making

as many sales.  (Doc. 27, Att. 4 at 8, Att. 5 at 2).  Thus, although both before and after her first

pregnancy, she was assigned to a "problem community," she attempts to distinguish her post-

pregnancy assignment on the grounds that the Defendant tried to blame her poor performance post-

pregnancy on her because she was the full time sales representative at that property.  (Doc. 27, Att.

5 at 2).

      The FMLA does not require that an employee be returned to the exact position that she

held prior to taking leave.  *Brown v. J.C. Penney Corp.*, 924 F. Supp. 1158, 1163 (S.D. Fla. 1996).

Instead, the FMLA entitles a restored employee to only those rights, benefits or positions "to

which the employee would have been entitled had the employee not taken the leave."  *Lempres v.

CBS Inc.*, 916 F. Supp. 15, 20 (D.D.C. 1996) (citing 29 U.S.C. § 2614(a)(3)(B)).  Indeed, the

"'equivalent position' provision under § 2614(a)(1)(B) recognizes the dynamic needs of employers

and permits them to restore employees to positions other than the exact one they left . . . ."  *Hoge

v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 245 (6th Cir. 2004).  Therefore, the "equivalent

position" requirement means "that which is substantially equal or similar, not necessarily identical

or exactly the same."  *Watkins v. J&S Oil Co., Inc.*, 164 F.3d 55, 59 (1st Cir. 1998); *see also Hunt

v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 767 (5th Cir. 2001) ("An equivalent position is

virtually identical to the employee's former position in terms of pay, benefits and working

conditions, including privileges, prerequisites and status."); *Cross v. S.W. Recreational Indus.,*

*Inc.*, 17 F. Supp. 2d 1362, 1370 n.1 (N.D. Ga. 1998) ("An equivalent position must have the same or substantially similar duties and responsibilities, skill requirements, and authority as an employee's existing position.") (internal citation and quotation omitted).

Martinez' assertion that she was denied a substantially similar position upon her return from FMLA leave is tenuous.  When she left, and when she returned, she worked as a sales representative.  She has offered no evidence that her benefits changed and, indeed, admits that they did not.  She has presented no evidence that the manner in which she was compensated changed, such as by demonstrating that her salary or commission rate was modified.  Further, the fact that she earned less in commissions would necessarily result from her failure to make sales, not from the defendant changing the manner in which she was paid.  At best, Martinez has shown that, prior to taking leave, she worked from (or was based at) a single property, but that after taking leave, she was moved from property to property with some regularity.  Because this may be considered different working conditions, the Court will presume for the purposes of this analysis (while noting that this presumption is a stretch) that Martinez has stated a *prima facie* case of FMLA discrimination.

However, as the Defendant points out, one must take into consideration the fact that Martinez' moves were based on a combination of two factors: first, she temporarily filled in for other sales representatives while she was interviewing for a management position, a better position than that which she left, and one about which she cannot realistically complain as being unequal; and, second, she was assigned to various properties as needed while she was awaiting permanent assignment at a property to which she requested to be assigned.  These are legitimate non-discriminatory reasons for the manner in which Martinez was treated upon her return from FMLA

leave, and Martinez has failed to either rebut these reasons or show that they are merely pretextual. Martinez has therefore failed to carry her burden of persuasion regarding her claim of a denial of FMLA benefits.  A claim for denial of FMLA rights (and thus an employer's liability) simply cannot rest on different working conditions caused by either the employer's attempt to promote the employee, or the employee's efforts to accommodate the employee's wishes, once the employee returns from leave.

### ii. Retaliation

Martinez also claims that she was retaliated against after returning from maternity leave by being sent from community to community.[25]  (Doc. 27, Att. 4 at 9).  She asserts that no one else was being "bounced around" the way she was, and she implies that she was treated that way because she had taken maternity leave.  (*Id*. at 10).  She concedes, however, that the first thing that happened upon her return from maternity leave was that she was considered for a management position, and that she wasn't assigned to a single community because "they wanted to wait and see about the interview process."  (*Id*. at 10).  She also admits that being considered for a management position would not constitute retaliation.  (*Id*.).  She claims that after being interviewed, she could have been assigned to a community, but instead, she was asked to help out by going "from place to place," while new hires were being given new communities at which to work.[26]  (*Id*.).  She also asserts that although the Defendant honored her request to be assigned to the Enclave, they knew

---

[25] Martinez also claims that the Defendant retaliated against her by "purposely giving her less desirable assignments that had the effect of decreasing [her] compensation. This was done to encourage [her] to resign her employment."  (Doc. 1 at 4).

[26] Martinez fails, however, to point to a single new hire who was treated in such a manner.  *See* section III(C)(1), *infra*.

that the Enclave "had problems" such as overpricing on houses as a result of unfavorable deals with the developer.  (Doc. 27, Att. 5 at 14).  However, she admits that these pricing decisions were not made to retaliate against, or punish her, but instead that it was simply an unfavorable circumstance that made her sales go down, a circumstance about which no one was happy.  (*Id*.).

The Court presumes that Martinez has stated a *prima facie* claim of retaliation.[27] Nevertheless, her claim must fail because the Defendant has offered legitimate, non-discriminatory reasons for the manner in which Martinez was treated, which reasons she has failed to rebut.  As with the discrimination claim, the Defendant points to the fact that Martinez' temporary assignments to various properties were due to two circumstances: first, she was interviewing for a management position (which even Martinez concedes is not retaliation); and, second, she was temporarily assigned to those communities while waiting for a more permanent assignment to a community that she requested.  Martinez' argument that she was "floating" while other, newer sales representatives received more permanent assignments, and was thus treated differently and unfairly, simply ignores these two circumstances.   Therefore, Martinez has failed to carry her burden of persuasion with regard to her FMLA retaliation claim.

C. Pregnancy Discrimination[28]

Congress amended Title VII by enacting the Pregnancy Discrimination Act, which expands the definition of sexual discrimination and states, in relevant part:

---

[27] As before, the Court notes that this presumption is tenuous.

[28] The Court notes that Martinez failed to specifically address this claim in her responsive memorandum.  However, in an abundance of caution, the Court will construe her arguments as applying to this claim, as well.

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise.

42 U.S.C. § 2000e(k).[29]  Pregnancy is therefore a protected classification under the statute.

*Maddox v. Grandview Care Ctr., Inc.*, 780 F.2d 987, 989 (11th Cir. 1986).  Title VII's substantive rules regarding sex-based employment discrimination thus apply with equal force to employment discrimination based on pregnancy, and the "analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits."  *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1312-13 (11th Cir. 1994).  Thus, to state a *prima facie* case of pregnancy discrimination under Title VII, the plaintiff must show that: "1) she was a member of a protected class, 2) she was qualified for her position, 3) she suffered an adverse effect upon her employment, and 4) she suffered from differential application of work or disciplinary rules."  *Armindo v. Padlocker, Inc.*, 71 F. Supp. 2d 1238, 1239 (S.D. Fla. 1998); *see also Spivey v. Beverly Enters., Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999).

---

[29] Title VII provides, in relevant part, that:

It shall be an unlawful employment practice for an employer –

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . .

42 U.S.C. 2000e-2(a)(1).

In a disparate treatment case, the plaintiff must show "discriminatory animus on the part of the defendant[,]" *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1520 (11th Cir. 1995), or, in other words, "must prove that the employer intentionally discriminated against her." *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539, 546 (11th Cir. 1991). If the plaintiff cannot present direct evidence of discriminatory intent, she may offer "circumstantial evidence from which an inference of intentional discrimination may be drawn." *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994).

The Court will not rehash its findings regarding the majority of Martinez' claims in this regard. For the reasons stated above, her claims of discrimination on the grounds that the Defendant failed to return her to an equivalent position, gave her less desirable assignments, and terminated her when she gave notice of intent to take pregnancy leave a second time, all fail. Thus, the only claim that the Court analyzes here is Martinez' assertion that she was treated differently than other employees. In this regard, Martinez asserts that she was treated differently on two grounds: first, new employees were assigned to new communities whereas she was required to "float;" and, second, other employees also failed to meet the sales requirements but were not terminated.

*1) Assignments to new communities*

Martinez' assertions in this regard are baffling at best. First, it is notable that both of the communities to which Martinez was assigned (at her request), the Enclave and East Park, were new communities at the time she was assigned there. (Doc. 27, Att. 2 at 17; Doc. 37 at 20, 26; Doc. 41, Att. 2 at 6). In addition, there were no new communities available prior to her assignment to the Enclave, and she was the first person assigned to that new community. (Doc.

41, Att. 2 at 5; Doc. 37 at 26).   Martinez also admits that, upon her return from FMLA leave, she

was not immediately assigned to any community in particular because she first interviewed for a

management position and then was filling in while she waited for assignment to the Enclave

(which she had requested).  (Doc. 27, Att. 3 at 7).  Finally, in her Memorandum, to support her

assertions in this regard, Martinez makes only the conclusory assertion that "a number of new hires

were being given new communities at around the time the Plaintiff returned from FMLA leave."[30]

(Doc. 36 at 6).  This assertion is not sufficient, and Martinez' evidence in this regard does not

create an issue of fact suggesting that Martinez was treated differently upon her return on the basis

of assignments to new communities.

   *2) Lack of sales*

To determine whether employees are "similarly situated" for establishing a *prima facie*

case of discrimination, courts are to consider "whether the employees are involved in or accused of

the same or similar conduct and are disciplined in different ways."  *Holifield v. Reno*, 115 F.3d

1555, 1562 (11th Cir. 1997).  The plaintiff must show "that [she] and the employees are similarly

situated in all relevant respects," *id*., such as "performance, qualifications and conduct, without

such differentiating or mitigating circumstances that would distinguish their situations."  *Smith v.*

*Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994) (internal citation and quotation omitted); *see*

_____

[30] The evidence shows, however, that a number of the people to whom Martinez refers were not actually assigned to new communities upon being hired.  Twiggy Reyes was pulled from an existing community and assigned to a new community.  (Doc. 27, Att. 5 at 5, 13).  Joan Favor was assigned to a new community, but Martinez cannot say how long after Favor was hired that this occurred.  (Doc. 27, Att. 3 at 6).  Martinez admits that Brian Edwards was not actually assigned to a new community.  (*Id*.).  While Erin Merola and Jeffri Rimmer were assigned to new communities, these assignments do not appear to have occurred until after Martinez was assigned to the Enclave, which was also a new community.

*also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) ("[T]o be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). The "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id.*

Both Toro and Quintana, in discussing the Defendant's disciplinary actions, noted the following: (1) decisions are based on both sales and customer satisfaction ratings, (Doc. 37 at 14); (2) sales are reviewed on a monthly basis for an entire year, (*id.* at 16, 37); (3) the sales requirement is partially dependent upon the particular community at issue, (*id.* at 21); and (4) once an employee receives a thirty-day warning, they may be terminated after that, or the warning period may be extended, depending upon the nature of the situation. (Doc. 41, Att. 2 at 4).

Martinez asserts that a number of similarly situated individuals, none of whom took FMLA leave for pregnancies, failed to meet sales goals yet were not terminated. She points to the following individuals: Quintana, Erin Merola ("Merola"), Jennifer Warlick ("Warlick"), Richard Vega ("Vega") and Twiggy Reyes ("Reyes").[31]

---

[31] With the exception of Quintana, Martinez relies on the sales performances of these individuals for the year 2002, noting that all of them failed to meet the requirement yet were not terminated thereafter. Ironically, however, Martinez not only also failed to meet the requirement during that same time, but sold less houses than all of these individuals except for Merola, who sold

Martinez asserts that Quintana fell below the sales requirement in both February and March of 2003, yet was not terminated.  However, Quintana sold three and four homes, respectively, in those months, and made those sales in a close-out community.  (Doc. 37 at 46).  Quintana had also been promoted to a management position at that time.  Martinez was neither a manager nor working in a close-out community, and thus Quintana is not similarly situated.

Martinez asserts that Merola failed to achieve the sales requirement from September through December of 2002.  During that time, Merola sold eleven homes, whereas the requirement, at four homes per month, would have been sixteen homes.  (Doc. 37 at 48).  During this time, Martinez sold five homes, and thus the nature of their "misconduct" is not essentially the same.  (Doc. 42, Att. 1).  Furthermore, Martinez has not demonstrated how she and Merola were similarly situated, particularly as it appears that Merola only began working for the Defendant in September, and thus would not be similarly situated with Martinez in terms of experience.[32]

Next, Martinez points to Warlick, and asserts that Warlick failed to meet the sales requirement for the year 2002, yet was not terminated thereafter.  Much like Martinez, Warlick did receive a written warning based on her deficient performance, and was not immediately terminated.  (Doc. 37 at 29).  Unlike Martinez, however, Warlick's performance improved after

---

only one fewer house than Martinez while working six fewer months than Martinez.

[32] The Court notes that Merola was ultimately terminated in 2005 due to insufficient sales. (Doc. 37 at 48).  Martinez has not demonstrated how their treatment differed, other than the fact that Merola was not immediately terminated after December of 2002.  Martinez' evidence is thus not sufficient, particularly when one notes that her sales were lower than Merola's during the same time, yet Martinez was not fired immediately afterward, either.

receiving that warning.  (*Id*.; *see also* Doc. 28 at 2).  Warlick is thus not an appropriate comparator.

Fourth, Martinez asserts that Vega failed to meet the sales requirement for the year 2002, yet was not terminated.  Vega, however, was a new hire, who was likely in training for as many as three months, during which time he might not have made sales.  (Doc. 41, Att. 2 at 10).  Thus he and Martinez are not similarly situated.

Finally, Martinez asserts that Reyes failed to meet the sales requirement for the year 2002, yet is still employed by the Defendant.  During that time, however, Reyes had a 95% customer satisfaction rating (far higher than Martinez' rating), and thus was not fired because of her high scores in that area.  (Doc. 41, Att. 2 at 10).  Reyes also sold more than double the number of houses that Martinez sold during 2002.  (Doc. 42, Att. 2).  For both of those reasons, Reyes and Martinez were not similarly situated.[33]

Martinez has failed to identify a single similarly situated employee.  She has not pointed to anyone who shared similar qualifications or experience with her, has not shown how her experience and assignments compared to those of any other sales representatives, nor has she identified anyone who engaged in nearly identical misconduct.  Therefore, Martinez has failed to

---

[33] Martinez fails to point to a number of sales representatives who failed to meet sales requirements, including Glenda Roig, Steven Quintana, Sylvia Barlow and Nilda Robles, all of whom were terminated.  (Doc. 37 at 51, 66-67).  Tom Akerman was also terminated for a lack of sales.  (Doc. 37 at 30).  In addition, Melissa Ziegler received a written warning in December of 2002 as a result of poor sales, after which her performance did not improve and she was terminated in February of 2003. (Doc. 28 at 2).

establish a *prima facie* case of discrimination,[34] and the Defendant is entitled to summary judgment on this claim.  *Holifield*, 115 F.3d at 1562-63.

## IV.      Conclusion

For the reasons stated herein, Martinez has failed to support her claims of discrimination and retaliation under the FMLA, as well as her claim of discrimination under the Pregnancy Discrimination Act.  Accordingly, it is

**ORDERED THAT** the Defendant's Motion for Summary Judgment is GRANTED.  This case is removed from the January 2006 trial docket, and the Clerk is directed to close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on October 17, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

---

[34] Even if Martinez established a *prima facie* case of discrimination, the Defendant states that she was ultimately fired for a combination of poor sales performance (which Martinez does not dispute, but only tried to explain away based on various circumstances) and poor customer satisfaction ratings.  (Doc. 28 at 3).  This is a non-discriminatory reason, which Martinez has failed to rebut, and therefore Martinez has failed to carry her burden of persuasion.